*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

SUPREME COURT DOCKET NO. 2013-267

NOVEMBER TERM, 2013

| | | |
|---|---|---|
| Valerie Zimmerman and PopXue America, LLC | } | APPEALED FROM: |
| | } | |
| | } | |
| | } | Superior Court, Washington Unit, |
| v. | } | Civil Division |
| | } | |
| | } | |
| Bruce Bjornlund, Esq. | } | DOCKET NO. 208-3-09 Wncv |

Trial Judge: Geoffrey W. Crawford

In the above-entitled cause, the Clerk will enter:

Plaintiff PopXue America, LLC, appeals from the trial court's order granting judgment to defendant Bruce Bjornlund on its legal malpractice complaint. Plaintiff suggests that it was entitled to judgment in its favor as a matter of law. We affirm.

The court made the following findings, which are unchallenged on appeal. This case concerns a twelve-acre parcel of undeveloped land in Waterbury, Vermont, which plaintiff purchased in 2006. The land is located at the northeast corner of the intersection of Route 100 and Guptil Road. The land was originally part of a farm owned by the Grenier family. In 1967, Theodore Barnett acquired the property as part of a 122-acre parcel. Barnett transferred the property to Elmore Realty Corporation, a company he controlled.

In 1971, Elmore Realty divided the 122 acres. It retained ownership of the twelve acres bordering Route 100, and sold 110 acres to Aigner Enterprises, Inc. The 110-acre parcel did not border Route 100. The 1971 deed to Aigner included a right of way across the twelve acres, described as follows:

> The property conveyed herein contains 110.85 acres, more or less. There is also conveyed a right of way from Vermont Route #100 to the parcel conveyed herein, across the parcel reserved herein. The actual location of the right of way shall be determined by the parties and when the right of way is developed, its location shall then become fixed. This right of way shall be 50 foot in width.

In 1971, Barnett also recorded a map of the entire property (the twelve-acre parcel and the 110-acre parcel). This map showed a proposed subdivision of the 110 acres into twelve home sites with road access from Route 100 across the twelve acres as well as access from Guptil Road. Barnett was a real estate developer who was active in many towns in Vermont. It was his

practice to record maps and drawings showing potential subdivisions even if the development took a different direction.

The subdivision and proposed road depicted in Barnett's map was never built. Instead, Aigner sold the back lot (the 110 acres) to the Smart Corporation, which sold three home lots with access onto Guptil Road. One of these lots was subdivided, bringing the total number of house lots to four. There are four single-family lots today. Each lot has road access from Guptil Road. They are separated from the noise and traffic on Route 100 by the twelve-acre parcel. No one has ever proposed to build any portion of the "proposed road" shown on Barrett's map. No one has ever proposed to fix the location of the right of way contained in the Aigner deed.

Between 1971 and 2006, the twelve acres remained the property of Elmore Realty and its successors, Barnett and his colleague Ezra Nasser. In 2005-2006, a local realtor named Valerie Zimmerman and her partner Dennis Marshall became interested in purchasing and developing the twelve acres. Zimmerman and Marshall formed PopXue America, LLC to hold title. Zimmerman was familiar with the property because she had listed it with her real estate brokerage from time to time, always without success. Marshall is an excavator and developer who frequently purchases land for development purposes. The twelve-acre parcel contained wetlands, which created potential problems with its development.

Marshall's attorney was defendant Bruce Bjornlund. The two had worked together for over thirty years. Marshall was in the habit of stopping by defendant's office to discuss projects that interested him, including the twelve-acre parcel in question. Marshall and Zimmerman hired defendant to do the title work for the twelve-acre parcel, and Marshall stopped by frequently to discuss the real estate transaction with defendant.

Defendant's assistant searched the title. She brought copies of Barnett's map and the Aigner deed to defendant. The two discussed the map and the unlocated right-of-way. Defendant and his assistant met multiple times with Marshall to go over the transaction. They discussed the map and the unlocated right of way in the Aigner deed. Defendant told Marshall that the map and the right of way did not affect marketability of the title because the development of the 110-acre back lot had taken a different direction—the subdivision depicted on the map never occurred. No drive was ever constructed to Route 100 because all lots created by Smart Corporation had their own access to Guptil Road. Defendant explained to Marshall that no one would spend time and money constructing a new road across the twelve acres when they already had access to a public road. Marshall denied having these discussions with defendant and his assistant. He admitted at most to seeing Barnett's map.

In July 2006, plaintiff purchased the twelve acre lot for $75,000. The title opinion provided at closing did not mention the easement in the Aigner deed. Barrett's map was identified in the paragraph concerning "surveys." The title opinion contained no disclosure or warning concerning the potential establishment of a right of way over the property.

Marshall and Zimmerman originally planned to develop the property themselves and build two three-bedroom homes with a shared septic system, but very quickly abandoned this plan and decided to sell the property. In 2007, a developer became interested in the property. The developer's company, Penny Lane, purchased approximately one half of the twelve-acre lot

for $120,000 with an option to buy the other half for $130,000. The developer planned to build six condominium units for seniors. He intended to use the same septic plans as those developed by Marshall and Zimmerman. Shortly after closing, Penny Lane demanded that plaintiff obtain a conditional use determination (CUD) for the septic system. Plaintiff retained an engineering firm to draw up plans and in January 2008, the Agency of Natural Resources issued a CUD. Penny Lane began to market the senior condos on a preconstruction basis.

In April 2008, an attorney for Penny Lane discovered the Aigner deed and the unlocated right of way. Penny Lane took the position that the site could not be developed because the right of way would have to cross over the septic area. The engineer who completed the CUD application advised the developer that there was room for a fifty-foot right of way without any change to the leach field or other aspects of the septic design. Unpersuaded, Penny Lane sued plaintiff seeking rescission of the sale; Penny Lane also sued its title attorney seeking damages. Plaintiff in turn sued defendant Bjornlund. Penny Lane settled its claim against its title attorney. Penny Lane and plaintiff also settled. That settlement took the form of a stipulated judgment order providing for rescission of the deed and the return of the purchase money plus interest and attorney's fees to Penny Lane at the conclusion of the current lawsuit.

Turning to the elements of plaintiff's claim against Bjornlund, the court explained that a title attorney owed a duty of care to his client to disclose easements and other encumbrances on the title and to explain their significance. The court found that defendant satisfied this duty here. He discussed the deed and map with Marshall, and he accurately described the import and potential effect of the encumbrances. He provided a title opinion in which he stated that plaintiff would receive marketable title. The court found that defendant's advice that the right of way would not prevent development was reasonable and accurate.

The court explained that marketable title was defined as a title whose "validity cannot be said to involve a question of fact, and is good as a matter of law." First Nat'l Bank v. Laperle, 117 Vt. 144, 157 (1952). The court considered each alleged encumbrance separately. First, it found that Barrett's map established nothing. Neither the proposed road nor the pictured subdivision was ever built. The map did not convey any rights to anyone; it was simply a sketch of the shape one owner believed development might take in the future. The court concluded that no one could bring suit on the strength of the map and impose the road depicted therein on his neighbors. It was, as defendant explained to Marshall, a nullity. The court thus concluded that showing Marshall the map and explaining its lack of consequence was sufficient to meet the attorney's standard of care.

As to the easement in the Aigner deed, the court noted that as the property had been developed, each of the four homeowners had turned to Guptil Road for road access. In more than twenty years, no one had ever approached the owners of the twelve-acre parcel and exercised his or her right to locate a second driveway across the twelve-acres to Route 100. There was undisputed trial testimony, moreover, that by the time Marshall discussed the easement with defendant, it had become very unlikely that the Agency of Transportation would permit a new and unnecessary curb cut onto Route 100 for property that already had adequate road access onto Guptil Road. The court found that these factors made the assertion of a right of access very unlikely. Finally, the court observed that the issue was not whether there was an easement or whether someone might decide to act upon it someday. Rather, the question was

3

whether the easement prevented the development of the twelve acres. On this question, the court found the evidence very strong that either the original PopXue plan of two residences served by a common septic system or the Penny Lane plan for six senior citizen townhouses was consistent with a driveway between the Aigner property and Route 100. In the unlikely event that a successor to the Aigner deed established that he or she was the person in possession of rights under the easement, there was a practical route across the twelve acres that avoided the planned development and the wetlands.

The court found that what had developed through the discussions between defendant and his client was that the easement presented a problem that was unlikely to occur. The lawyer's job was to advise the client of the potential problems so that the client could make an informed decision about the risks and benefits of the transaction. The court found strong evidence that just such a discussion occurred over the course of several visits by Marshall to the defendant's office.

As to the problems that arose with Penny Lane, the court found strong circumstantial evidence that the developer had seized upon the easement as a pretext for abandoning a deal that had become too costly for him. In its decision, the court provided numerous reasons to support this conclusion. Ultimately, as set forth above, the court concluded that defendant's advice that the easement and the map would not interfere with the marketability of title appeared reasonable at the time and, indeed, even today despite all the litigation. It explained that the damages sustained by plaintiff and its principals—chiefly the rescission of the sale of the property and resulting costs—were not caused by defendant's advice. Rather, the rescission was best understood as the result of a change of heart by Penny Lane which sought and found a pretext for walking away from its purchase. The court thus entered judgment for defendant and this appeal followed.

Plaintiff appears to argue that defendant must have committed legal malpractice simply because Penny Lane filed a lawsuit against it. The trial court concluded otherwise and its unchallenged findings, set forth above, amply support its conclusion.[*] The court recognized that "[i]n conducting a title search for a client, an attorney has a duty to inform and explain to the client the implications of any clouds on the title that would influence a reasonably prudent purchaser not to purchase the property." Estate of Fleming v. Nicholson, 168 Vt. 495, 498 (1998). It found that defendant complied with that duty here. Defendant discussed on numerous occasions both the map and the Aigner deed and the implications of these documents, and the court found that his advice was reasonable and accurate. As set forth above, it concluded that Penny Lane's lawsuit was driven by its desire to get out of the land deal, and that development of the lot remained feasible.

Plaintiff's remaining arguments are equally unpersuasive. Plaintiff suggests that Barrett's map was not a nullity as found by the trial court. The cases cited by plaintiff as support for this argument are inapposite. Both involve plats of subdivisions that were approved and constructed, or at least partially constructed. See, e.g., Clearwater Realty Co. v. Bouchard, 146 Vt. 359, 363-64 (1985) (recognizing the "familiar principle of law that where lots are sold by

---

[*] Plaintiff did not order a transcript of the proceedings below, and thus, it has waived any challenge to the court's factual findings. V.R.A.P. 10(b)(1) (appellant must produce transcript if appellant challenges findings or evidence in support thereof).

4

reference to a recorded plat, lot purchasers acquire the right to keep open and use roads, streets, highways, and park areas as indicated on the plat," and explaining that the object of this principle is "to secure to persons purchasing lots under such circumstances those benefits, the promise of which, it is reasonable to infer, has induced them to buy portions of a tract laid out on the plan indicated"); Crabbe v. Veve Assocs., 150 Vt. 53 (1988) (case involving deeded easements in lots sold as part of a partially constructed subdivision). As explained above, Barrett's proposed development never came to pass, and no enforceable legal rights were created by this map. Plaintiff's contention that they remain in the "shadow of further litigation" based on this map is baseless. To the extent that plaintiff refers to the Aigner deed as creating a shadow of future litigation, its claim is speculative. In any event, the key issue is whether defendant informed and explained the effect of the encumbrances, and the record amply supports the court's conclusion that he did so here.

Affirmed.

BY THE COURT:

_____
Marilyn S. Skoglund, Associate Justice


_____
Beth Robinson, Associate Justice


_____
Thomas A. Zonay, Superior Judge,
Specially Assigned

5